FILED
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2002 MAR -8  P 3: 01

NATIONAL MORTGAGE : 
WAREHOUSE, LLC, : 
      Plaintiff : 
 : DEPUTY
 : 
    v. : Civil Action No. CCB-00-2881
 : 
 : 
BANKERS FIRST MORTGAGE CO., : 
INC., et. al. : 
      Defendants. : 


SOVEREIGN BANK, : 
      Plaintiff : 
 : 
 : 
    v. : Civil Action No. CCB-01-057
 : 
 : 
BANKERS FIRST MORTGAGE CO., : 
INC., et. al. : 
      Defendants. : 

          **CONSOLIDATED UNDER**
          **Civil Action No. CCB-00-2881**


<u>**MEMORANDUM**</u>

    Plaintiff Sovereign Bank ("Sovereign"), has sued, *inter alia*, Defendant Security Title

Guarantee Corporation of Baltimore ("Security Title") based on the alleged misconduct of

Security Title's issuing agent, Title Express, through its president, Christopher Trikeriotis.

Security Title has moved for summary judgment on plaintiff's claims.  The motion has been

briefed fully, including supplemental memoranda, and no hearing is necessary.  *See* Local Rule

105.6.  For the reasons that follow, the defendant's motion will be granted.



## BACKGROUND

This action arises from a mortgage lending scheme between a local mortgage lender, Bankers First Mortgage Company, Inc. ("Bankers"), and a title agent, Title Express, Inc., to defraud national mortgage lenders of millions of dollars by submitting loan documents for nonexistent borrowers and using the funds advanced for their private gains. It is undisputed that both Kent Baklor, president of Bankers First, and Christopher Trikeriotis, president of Title Express and general counsel for Bankers First, knowingly participated in the scheme. (Def. Reply, Exh. A, Depo. of K. Baklor, p. 116.) *See also United States v. Christopher Trikeriotis*, Crim. No. CCB-01-0442 (D. Md. 2001) (defendant Trikeriotis pleads guilty and admits to details of the scheme in his statement of facts). Sovereign Bank, the plaintiff in the motion now pending, was one of two national mortgage lenders defrauded as a result.

### A. The Fraudulent Loans

Sovereign Bank extended a line of credit to Bankers First for the purpose of funding residential mortgages. *(See Pl. Exh. 1, Aff. of J. Fasoldt, ¶¶ 2-4.)* For each loan it wanted funded, Bankers was required to prepare a package of supporting documents and send it to Greenshield, Sovereign's assignor, for processing. (*Id.* at ¶ 7.) The loan package included information about the borrower, a copy of the mortgage, a copy of the promissory note, a signed promissory note from Bankers First securing the requested loan advance, and, at times, a closing protection letter from Security Title offering to insure Bankers from any loss resulting from negligence or malfeasance by Title Express in closing the loan. (*Id.* at ¶¶ 8, 13, 15; *see, e.g.*, Pl. Exh. 1(E), "'Kirkendall' Loan Document Package.") After reviewing the information and approving the request, Greenshield would deliver to Sovereign a "Transmittal Schedule & Wire Advance Request," indicating where the money should be wired, in what amount, and

2

information concerning the investor who would eventually purchase the loan from Sovereign. (*Id.* at ¶ 9.) Sovereign would then wire the funds to Title Express' escrow account so Trikeriotis could close the loan by obtaining the necessary signatures and disbursing the money to the residential loan borrower. (*Id.* at ¶ 10.) Bankers First was expected to repay Sovereign within 90 days of finding a third party investor willing to purchase the loan. (*Id.* at ¶¶ 9-11.)

From July 2000 to August 2000, Title Express and Bankers First created and submitted twelve loan packages for nonexistent borrowers and kept for themselves the money Sovereign wired in response. (*See, e.g.*, Pl. Ex. E, "'Kirkendall' Loan Document Package.") Sovereign has sued them to recoup its losses, which totaled $1,523,557.00.[1] (Complaint, p. 12, "Relief Requested.") This court entered judgment in favor of Sovereign and against Title Express and Trikeriotis, jointly and severally, on January 15, 2002.

### B. *Sovereign's Claims Against Security Title*

In 1997, defendant Security Title, a title insurance underwriter, entered into a customary Agency Agreement with Title America, Inc., through its president, Christopher Trikeriotis. (Def. Exh. 2, Aff. of R. Schapiro, ¶ 3.) Title America subsequently became Title Express. (*Id.*)

Sovereign does not allege that Security Title was ever knowingly or directly involved in the fraudulent scheme. It does, however, contend that since ten of the twelve fictitious loan packages included a copy of a Security Title closing protection letter dated July 11, 2000, Security Title is liable for its loss. (Pl. Exh. 1, Aff. of J. Fasoldt, ¶ 15; Pl. Exh. 4, "Closing Protection Letter.") Sovereign sets forth two theories under which Security Title may be held

---

[1] Sovereign filed its complaint against Bankers First, Kent Baklor, Title Express, Christopher Trikeriotis, and Security Title on January 2, 2001. The case was subsequently consolidated for all purposes with *National Mortgage Warehouse, LLC v. Bankers First et al.*, CCB 00-CV-2881 (the "NMW Case"). The facts underlying the NMW case are nearly the same, except that 55 fraudulent loans were made, resulting in a loss of $4,500,000.

liable. First, Sovereign argues that Trikeriotis was the actual and/ or apparent agent of Security

Title, and therefore Security Title is responsible for his misconduct in settling the fictitious loans

(the "Agency Claim"). Plaintiff further contends that the 1999 Security Title closing protection

letter enclosed in ten of the twelve fraudulent loan packages insured it from any loss resulting

from Trikeriotis' negligence or misconduct in relation to the loans (the "Insurance Claim"). (*See*

Complaint, pp. 10-12, ¶¶ 56-70.) For the following reasons, the court rejects both of Sovereign's

claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of
> some alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest

upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that

there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840

F.2d 236, 240 (4th Cir. 1988). The court must "view the facts and draw reasonable inferences in

a light most favorable to the nonmoving party," *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.

1994), but it also must abide by its affirmative obligation to ensure that factually unsupported

4

claims and defenses do not proceed to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986)).

## **ANALYSIS**

*I. The Agency Claim*

In Count VII of its complaint, Sovereign asserts that Trikeriotis had the actual and/ or apparent authority to act for Security Title in issuing title insurance, acting as escrow agent, and conducting closings with regard to the fraudulent transactions. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." RESTATEMENT (SECOND) OF AGENCY § 1 (1958), *quoted in Green v. H & R Block*, 735 A.2d 1039, 1047 (Md. 1999). The plaintiff has the burden of proving "the existence of the principal-agent relationship, including its nature and its extent." *Id*. at 1048 (*citing Hofherr v. Dart Industries, Inc.*, 853 F.2d 259, 262 (4th Cir. 1988)). While the question of agency is a factual one that must ordinarily be decided by the jury, "if the party alleging the existence of a principal-agent relationship fails to produce sufficient evidence to allow a reasonable fact finder to conclude that such a relationship exists, then summary judgment [is] proper on the agency issue." *Id.*

*A. The Actual Agency Claim*

The existence of an actual agency relationship may be established by written agreement or inference. *Patten v. Board of Liquor*, 667 A.2d 940, 947 (Md. App. 1995). In examining that evidence, the court considers three important characteristics: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Green*, 735 A.2d at 1048. Sovereign proffers the July 12, 1999 closing protection letter as evidence that Trikeriotis was authorized by

Security Title to conduct closings and act as escrow agent with respect to the twelve fraudulent

loans. (*See* Pl. Resp., p. 8.) That letter expired on July 11, 2000, one year after it was issued.

(Def. Exh. 3, "Closing Protection Letter.") Sovereign disbursed all of the funds for the twelve

fictitious loans between July 14, 2000 and August 29, 2000, after the letter had expired. (Def.

Exh. 2, Aff. of R. Schapiro, ¶ 10.) Thus, in determining the extent of Trikeriotis's actual

authority to conduct closings for Security Title, this court will not be guided by an offer of

indemnification that was expired on its face when Sovereign relied upon it. Rather, like other

courts called upon to determine the authority of an issuing agent where no valid closing

protection letter exists, the court will examine the Agency Agreement between Security Title and

Title Express to define the scope of Trikeriotis's  authority. *See, e.g.*, *Resolution Trust Corp. v.*

*American Title Ins. Co.*, 901 F. Supp. 1122, 1124 (M. D. La. 1995); *Cameron County Sav. Assoc.*

*v. Stewart Title Co.*, 819 S.W.2d 600, 603 (Tex. App. 1991); *but see Sears Mortgage Co. v. Rose*,

634 A.2d 74, 83 (N.J. 1993) (looking to the degree of control a title insurer exercises over an

approved agent and whether the insurer is in the best position to foresee and prevent

malfeasance, notwithstanding the express limits of the agency agreement).

Under the Agency Agreement, Title Express was expressly precluded from conducting

any settlement or closing business on behalf of Security Title. (Def. Exh. 1, "Agency

Agreement," Art. I, §§ 1, 2.) In examining similar agreements, courts have concluded that an

issuing agent may, in accordance with an agency contract, wear "two hats," one as an agent to

issue or sell title insurer's insurance policies, and the other as a settlement agent to conduct

closings on his or her own behalf. *See, e.g.*, *Security Union Title Ins. Co. v. Citibank (Florida)*

*N.A.*, 715 So.2d 973, 975 (Fl. Dist. Ct. App. 1998); *Cameron County*, 819 S.W.2d at 604. In

such cases, the title insurer is responsible only for the title insurance issued; it cannot be held

6

liable for the agent's participation in related closings or provision of escrow services.  *Id.*

Accordingly, in receiving and disbursing escrow funds for the fraudulent loans, Trikeriotis

exceeded his authority under the Agency Agreement.  Security Title, therefore, cannot be held

liable for his acts.

      *B.  The Apparent Agency Claim*

      Alternatively, Sovereign argues that Title Express and Trikeriotis should be treated as

agents of Security Title under the equitable theory of apparent agency.  According to this

doctrine, a principal is bound by the acts of another where the words or actions of the principal

cause the third party to believe the principal consents to or has authorized the conduct of the

agent.  *Parker v. Junior Press Printing Service*, 296 A.2d 377, 380-81 (Md. 1972).  The party

seeking to rely on the agency relationship must show:

> (1) that the principal has manifested his consent to the exercise of such authority
> or has knowingly permitted the agent to assume the exercise of such authority; (2)
> that the third person knew of the facts and, acting in good faith, had reason to
> believe, and did actually believe, that the agent possessed such authority; and (3)
> that the third person, relying on such appearance of authority, has changed his
> position and will be injured or suffer loss if the act done or transaction executed
> by the agent does not bind the principal.

*Homa v. Friendly Mobile Manor*, 612 A.2d 322, 335 (Md. 1992) (*citing* 3 Am. Jur.2d *Agency* §

80).  The third party must also have "'use[d] reasonable diligence and prudence to ascertain

whether an agent [was] acting within the scope of his or her powers.'"  *Integrated Consulting*

*Serv. v. LDDS Communications*, 996 F. Supp. 470, 477 (D. Md. 1998) (*quoting Hill v. State*, 585

A.2d 252 (Md. 1991)).  "'[T]he mere fact that one is dealing with an agent, whether the agency

be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to

'stop, look and listen,' and he who would bind the principal is bound to ascertain, not only the

fact of agency, but the nature and extent of the authority [].'"  *Id.* (*quoting Standard Acc. Ins. Co.*

*v. Simpson*, 64 F.2d 583, 589 (4th Cir. 1933)).

Recognizing that a court will look only to the conduct of the principal in determining a claim of apparent agency, *Integrated Consulting*, 996 F. Supp.2d at 476, Sovereign points to three acts by Security Title which purportedly demonstrate consent for Trikeriotis to conduct closings and provide escrow services on its behalf. These include Security Title's issuance of insurance policies on loans closed by Title Express; the issuance to Greenshield of a one-year closing protection letter dated March 3, 1998 (which was never submitted in connection with any loan request to Sovereign); and the issuance to Bankers First of a one-year closing protection letter dated July 12, 1999 (which was submitted to Greenshield in connection with ten of the twelve fraudulent loans). (*See* Pl. Response to Supp., Exh. B, Aff. of R. Cunnane, pp. 179-184.) The court addresses each of these in turn.

First, as the court has already discussed, a title agent may wear two hats; he may issue title insurance, for which an underwriter such as Security Title is wholly responsible, and, in the same transaction, act as closing or escrow agent, for which the underwriter may expressly disclaim liability. *See Security Union*, 715 So.2d at 975; *Cameron County*, 819 S.W.2d at 604. Accordingly, the mere fact that Security Title has issued title insurance policies for transactions in which Title Express participated as an escrow or closing agent does not, without more, make Title Express the apparent agent of Security Title.

Moreover, an issuing agent is not cloaked with apparent authority to conduct closings on the insurer's behalf merely because the insurer has issued closing protection letters for it in the past. Closing protection letters are issued by title insurers in connection with specific transactions. *See* John C. Murray, *Insured Closings: Title Company Agents and Approved Attorneys*, 462 Prac. L. Inst./ Real 457, 459 (Nov. 2000) ("The closing protection letter applies

8

only with respect to the particular transaction for which it is issued [].").  A protection letter

issued in 1998, therefore, cannot expand Trikeriotis's apparent authority unless it was issued in

connection with the particular transactions challenged in this case, *i.e.*, the twelve fraudulent

loans.  As Sovereign has made no showing to this effect, the 1998 protection letter is entirely

irrelevant to Sovereign's claim.

Lastly, in relying on the July 12, 1999 closing protection letter, Sovereign failed to use

the reasonable diligence and prudence that the law requires in ascertaining the extent of an

apparent agent's authority.  Indeed, had Sovereign – a sophisticated mortgage lender – stopped,

looked, or listened as the Fourth Circuit suggests that it should, *see Standard Acc. Ins. Co.*, 64

F.2d at 589, it would have observed a number of factors alerting it to the possible danger of

relying on the letter and prompting it to inquire further.  It would have noticed that the 1999

closing protection letter, copies of which were enclosed in each of the loan packages, was

expired on its face; the letter was not addressed to, and did not mention, Sovereign or

Greenshield; title insurance policies had not been ordered in connection with the loan requests;

and at least two of the loan document packages failed to include closing protection letters at all.

In his deposition, Robert Cunnane, Sovereign's representative, confesses Sovereign's

mistake in having relied on the 1999 letter.  (*See* Def. Suppl., Ex. A, Depo. of R. Cunnane.)

Calling the use of the 1999 letter "sloppy" and "a clerical screw-up," Cunnane admits it would

have been "reasonable" to expect a Sovereign or Greenshield employee to check on the validity

of an expired commitment letter.  (*Id.* at pp.133, 188, 227-228.)  He also concedes that the

expired letter was not the only insufficient document relied upon by Sovereign in deciding

whether to fund the fictitious loans.  (*Id.* at 73-77.)  Sovereign also disbursed funds based on

non-specific loan purchase commitment letters which, Cunnane testifies, violated Sovereign's

9

own internal procedures. (*Id.*) Given Sovereign's failure to notice and/ or inquire about any of these factors, or to follow its own internal policies in verifying the documents submitted for funding, it is difficult to believe the closing protection letter played much of a role in Sovereign's decision to fund the fictitious loans. Even if Sovereign did actually rely on the letter, its reliance was, by its own admission, unreasonable. Accordingly, the court rejects Sovereign's apparent agency claim.

## II. The Insurance Claim

In Count VIII, Sovereign asserts that Security Title is liable for the fraudulent acts of Title Express because the closing protection letter insured that the funds Sovereign entrusted to Trikeriotis as escrow agent would be properly used. The court will grant summary judgment to Security Title on this claim because the closing protection letter expired on July 11, 2000, before Sovereign transferred any funds to Bankers First for the questionable loans.[2]

---

[2] This is, of course, assuming that Sovereign can sue under the closing protection letter as an assignee or third party beneficiary. The closing protection letter is addressed to Bankers First. (*See* Pl. Exh. 4.) It does not mention Sovereign or GreenShield, (*Id.*), and Sovereign is not in an assignment relationship with Bankers First.

Sovereign argues that it was "the intended beneficiary of the closing protection letters and in fact stands to benefit from them if the insurance claims which were made are honored." (*See* Pl. Response, p. 6.) "In order for a person to recover as a third party beneficiary, he or she must show that the parties to the contract clearly intended that the third party benefit from it." *Parlette v. Parlette*, 596 A.2d 665, 669 (Md. App. 1991). While there is no evidence that Security Title issued the closing protection letter to Bankers with the clear intent of benefitting Sovereign, Sovereign argues that it should be treated as a third party beneficiary because it is the only logical party with an interest in purchasing title insurance in connection with the fraudulent loans. (*See* Pl. Response, p. 18.) It is true that Sovereign supplied the money for Bankers First to advance to the borrowers and claims to have based its decision to do so in part on Bankers First's inclusion of the closing protection letter in the loan document packages. An argument similar to Sovereign's claim that it should be able to sue under the contract was put forth in *Peaks v. A Home of Your Own*, Case No. 98022011 (Cir. Ct. of Baltimore, Md., filed Jan. 21, 1998), which ultimately settled out of court. No other case has been cited to the court that addresses Sovereign's particular theory of recovery.

Even if Sovereign could show that it should be treated as an assignee of Bankers First, a leading treatise asserts that a closing protection letter is intended to benefit only the addressee. J. BUSHNELL NIELSEN, TITLE & ESCROW CLAIMS GUIDE § 14 at 441 (Foundation Press 1996 and Cum. Supp. 2000). This interpretation flows naturally from the language of the July 12 letter, which does not express any intention to benefit any lender other than Bankers First. Instead of directly deciding whether an addressee's assignee can recover as a third party beneficiary under a closing protection letter, courts generally have ruled against assignees on other grounds. *See, e.g., First Financial Savings & Loan Ass'n v. Title Insurance Co. of Minnesota*, 557 F. Supp. 654 (N.D. Ga. 1982) (holding that "even assuming that plaintiff assignee is a beneficiary under the insured closing letter," defendant's loss fell outside the scope of that letter). Rather than resolving what appears to be an issue of first impression, this

In Maryland, insurance agreements are construed like other contracts and there is no rule that policies are to be construed more strongly against the insurer. *Collier v. MD – Individual Practice Ass'n, Inc.*, 607 A.2d 537, 539 (Md. 1992). Construction of a written contract is ordinarily an issue of law for resolution by the court. *Board of Educ. Of Charles County v. Plymouth Rubber* Co., 569 A.2d 1288, 1296 (Md. App. 1990); *University Nat'l Bank v. Wolfe*, 369 A.2d 570, 576 n. 7 (Md. 1977). Maryland follows the objective theory of contract law. *Aetna Casualty & Surety Co. v. Insurance Comm'r*, 445 A.2d 14, 19 (Md. 1982); *Orkin v. Jacobson*, 332 A.2d 901, 903 (Md. 1975). "A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *General Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985). Where the language of the agreement is clear and unambiguous, the court must presume the parties meant what they expressed in writing. *Id.*

The insured closing protection letter is, on its face, as clear and unambiguous as possible about the length of time in which its offer of protection stands. It is a one-page document, dated July 12, 1999, which provides, "[t]he protection herein offered will be effective on the date of this letter for any real estate transactions occurring on or subsequent to such date <u>and will continue for a period of one year from the date of this letter</u> or until canceled by written notice from the Company, whichever occurs first." (Def. Exh. 3, "Closing Protection Letter.") As previously stated, Sovereign disbursed funds for the twelve fictitious loans after the letter's cancellation date. (*See* Def. Exh. 2, Aff. of R. Schapiro, ¶ 10.) The court sees no reason to

court assumes without deciding that Sovereign can sue under the closing protection letter and resolves the insurance claim on other grounds.

11

obviate the clear language and intent of the parties by allowing the closing protection letter to survive beyond its express termination date.

Even if the court were to overlook the protection letter's expiration, the issuance of a title insurance policy is generally necessary for liability to ensue under a closing protection letter. *Fleet Mortgate Co. v. Lynts,* 885 F. Supp. 1187 (E.D. Wis. 1995). In *Fleet Mortgage*, a lender sued an issuing agent and title insurance company for losses arising out of the agent's mishandling of funds. *Id.* The insurer moved for arbitration pursuant to a clause in the title insurance policy covering the transaction. *Id.* In determining the relationship between the policy and closing protection letter, the court stated:

> The Practicing Law Institute has discussed the practice of title insurance companies issuing 'closing protection letters.' In its Real Estate Law and Practice Course Handbook Series, the Institute has stated the following about the ALTA closing letters: 'These letters are generally only available when title insurance has been ordered from an agent in connection with a particular transaction.' Raymond J. Werner, *Title Insurance in Troubled Times: What You Need to Know*, 375 Prac. L. Inst. Real 39,--- (1988). The letter 'is specifically limited to the acts of an agent that has been designated specifically by the lender to handle a transaction where title insurance will be issued by the company providing the letter.' Oscar H. Beasley, *Title Insurance 1989: Negotiating Additional Coverage, Exclusions from Coverage*, 331 Prac. L. Ins. Real 23, — (1989).

*Id.* at 1189-90; *see also* James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORTS AND INS. L.J. 845, 853 (Spring 2001) ("Regardless of whether a lender accepts a closing protection letter, the letter creates no obligation on the part of the title insurer unless and until the lender orders title insurance from the company and delivers closing funds and documents to the settlement agent.").

It is undisputed that Security Title insurance policies were neither ordered nor issued for the twelve fictitious loans. (Def. Exh. 2, Aff. of R. Schapiro, ¶ 12.) The closing protection letter in this case is based on the ALTA model, which, by its terms, makes the issuance of such

12

policies a precondition for Security Title's assumption of liability.  The closing letter states:

> When title insurance of The Security Title Corporation of Baltimore (hereinafter
> "the Company") is specified for your protection in connection with closings of
> real estate transactions in which you are a lender secured by a mortgage (including
> any other security instrument) of an interest in land, the Company, subject to the
> Conditions and Exclusions set forth below, hereby agrees to reimburse you for
> actual loss incurred by you in connection with such closings when conducted by
> an Issuing Agent (an agent authorized to issue title insurance for the Company)...

(Def. Exh. 3, "Closing Protection Letter" (emphasis added).)  Because Sovereign did not secure

title insurance with Security Title, the liability coverage extended by the closing protection letter

never went into effect.

To hold otherwise would be to enforce a gratuitous promise by allowing Sovereign to

benefit from a contract for which there was no consideration.  *Fleet Mortgage* is instructive in

this regard:

> Beyond the general recognition that closing letters are concomitant with the
> issuance of title insurance policies, there is another important factor: Fleet paid no
> extra consideration for the closing letters.  As a business, it is highly unlikely that
> Chicago Title, or any other title insurance company, would provide closing letter
> indemnification out of the goodness of its heart.  If the closing letters were a
> "separate contract" as Fleet urges, it would be very peculiar for Chicago Title to
> give such a promise without something in return.  Furthermore, if the promise was
> considered a separate contract unsupported by consideration, Fleet would be in a
> worse position because such a gratuitous promise is unenforceable.

885 F. Supp. at 1190; *See also Metmor Financial, Inc. v. Commonwealth Land Title Ins. Co.*, 645

So.2d 295, 297 (Ala. 1993) (closing protection letter is not insurance because insurance requires,

*inter alia*, the payment of premiums as consideration).  "It is fundamental that in order for a

contract to be binding, it must be supported by consideration." *Beall v. Beall*, 434 A.2d 1015,

1018 (Md. 1981); *Broaddus v. First Nat'l Bank*, 155 A. 309, 311 (Md. 1931).  In Maryland,

consideration is established by a showing of either detriment to the promisee or benefit to the

promisor. *Vogelhut v. Kandel*, 517 A.2d 1092, 1096 (Md. 1986).  None of the interested parties

13

(*i.e.*, Sovereign, Greenshield, or Bankers First) paid for the right to be insured and Security Title

gained no benefit from issuing the July 12, 1999 closing protection letter with regard to the

twelve fraudulent loans. Accordingly, the court rejects Sovereign's claim that it was "insured"

by Security Title for the fraudulent acts of Trikeriotis in providing escrow services for the

fictitious loans.

     A separate order follows.

3/08/02
Date

Catherine C. Blake
United States District Judge

14