IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| NATIONAL MORTGAGE WAREHOUSE, LLC | * |
| v. | * Case No. CCB-00-CV-2881 |
| BANKERS FIRST MORTGAGE CO., *et.al* | * |

\* \* \* \* \*

**MEMORANDUM IN SUPPORT OF DIANE BAKLOR'S AND WHAT'S UP DOC'S MOTION FOR SUMMARY JUDGMENT AGAINST THIRD PARTY PLAINTIFFS CHRISTOPHER TRIKERIOTIS AND TITLE EXPRESS, INC.**

Diane Baklor, by and through her counsel, Andrew C. White and Susan Q. Amiot of the Law Offices of Andrew C. White, LLC, hereby submits this Memorandum In Support of Diane Baklor's and What's Up Doc's Motion for Summary Judgment Against Third Party Plaintiffs Christopher Trikeriotis ("Mr. Trikeriotis") and Title Express, Inc. ("Title Express").

### I.     INTRODUCTION

As this Court is well aware, this case has a long history in both the civil and criminal arenas. The case arises out of Mr. Trikeriotis's and Kent Baklor's scheme to fraudulently obtain millions of dollars from two mortgage warehouse lenders. The two victim lenders (National Mortgage Warehouse and Sovereign Bank) each brought civil claims against, *inter alia,* Mr. Trikeriotis and Mr. Baklor, while the United States of America, through the United States Attorney for the District of Maryland, also brought criminal charges against both men.

During the course of the civil litigation, Mr. Trikeriotis and his company, Title Express, Inc., brought various Third Party Claims against Diane Baklor ("Mrs. Baklor") and a company called What's Up Doc Document Prep, Inc. ("What's Up Doc") These

claims included indemnification, contribution, defamation, and tortious interference with contractual relations.  Each of these claims were filed before Mr. Trikeriotis was charged with any crimes, and his claims were very much premised on his claimed innocence.

Much has occurred since Mr. Trikeriotis filed his Third Party claims.  On August 21, 2001, Mr. Trikeriotis was formally charged in United States District Court with perpetrating a wire fraud scheme against both NMW and Sovereign.  One month later, on September 21, 2001,  Mr. Trikeriotis appeared before the Court and pleaded guilty to to the fraud charge.  In open Court, he admitted that he and Kent Baklor had, in fact, orchestrated a scheme to defraud NMW and Sovereign of over $8 million using his title company (Title Express, Inc.) and Kent Baklor's mortgage company, Banker's First Mortgage, a company run by Mr. Trikeriotis.

Throughout the course of the civil discovery process in this case Mr. Trikeriotis invoked his Fifth Amendment rights and refused to answer any substantive questions about the subject matter of his claims.  His refusal to answer questions in the course of the civil case, coupled with his admission of guilt in the criminal case, precludes him now from continuing to waste this Court's resources with his pending claims.  There is simply no basis whatsoever for any of his claims against Mrs. Baklor or What's Up Doc, and summary judgment should therefore be entered in the latter parties' favor on all such claims.

**II.    PROCEDURAL HISTORY**

This case began in September 2000, when Plaintiff National Mortgage Warehouse, LLC ("NMW") filed suit against (among others) Bankers First Mortgage ("Bankers First"); its President, Kent Baklor ("Mr. Baklor"); Title Express; and its

President and Bankers First's general counsel, Mr. Trikeriotis for (among other things) fraud, deceit, and misrepresentation, arising out of a fraudulent scheme whereby the defendants induced NMW to fund mortgages for fictitious buyers backed by fictitious properties.  In January 2001, Plaintiff Sovereign Bank brought a similar civil against the same four defendants (among others), alleging (among other things) civil conspiracy and fraud.  On February 5, 2001, this Court consolidated the two cases into case no. CCB-00-2881.

On January 15, 2002, upon the Plaintiffs' motion for summary judgment, the Court entered judgment against Mr. Trikeriotis and Title Express, jointly and severally, as to Count III of NMW's Complaint (fraud, deceit, and misrepresentation) and as to Count III of Sovereign Bank's Complaint (fraud, deceit, and misrepresentation) for the full amount of NMW's and Sovereign Bank's losses (approximately $6 million).  (Court Paper No.  97).  Mr. Baklor and Bankers First settled with NMW on January 7, 2002 (Court Paper No. 92) and with Sovereign Bank on November 12, 2002 (Court Paper No. 114).

In the meantime, the Defendants brought cross-claims against each other, and Mr. Trikeriotis and Title Express brought Third Party Claims against Diane Baklor ("Mrs. Baklor") and What's Up Doc Document Prep, Inc. ("What's Up Doc") for indemnification (both suits), contribution (both suits), tortious interference with contract (the Sovereign Bank suit, S-01-0057), conspiracy (the Sovereign Bank suit, S-01-CV-0057), and defamation (the NMW suit, CCB-00-CV-2881).  Mrs. Baklor and What's Up Doc brought counter-claims to the Third Party Claims for legal malpractice in both suits.[1]

---

[1] What's Up Doc's claim for legal malpractice was dismissed by the Court on September 6, 2002.  By stipulation of the parties filed on March 1, 2004, Diane Baklor's legal malpractice claims were voluntarily

3

This motion seeks summary judgment in favor of Mrs. Baklor and What's Up Doc on all claims brought against them by Mr. Trikeriotis and Title Express.

In addition to these civil actions, the United States of America brought criminal charges against Mr. Trikeriotis, which resulted in his pleading guilty to criminal fraud. Mr. Trikeriotis entered his plea of guilty before this Court on September 21, 2001, in the case captioned *United States v. Trikeriotis*, Crim. No. CCB-01-0442. He was thereafter sentenced to 30 months imprisonment.

### III.   STATEMENT OF FACTS

NMW and Sovereign Bank were two mortgage lenders that extended a line of credit to Bankers First for the purpose of funding residential mortgages. Bankers First submitted a written request to the lenders for an advance for each loan along with copies of documents to be signed by the borrower at closing. Based on the representations in those documents, the lenders wired funds to Title Express, the title company and settlement agent used by Bankers First. Mr. Trikeriotis was supposed to close the loans by obtaining necessary signatures and disbursing the money to the residential loan borrowers, and Bankers First was expected to repay the lenders after finding a third party investor willing to purchase the loans. Unbeknownst to NMW and Sovereign Bank, Bankers First and Title Express created and submitted several loan packages for fictitious borrowers for the purpose of defrauding the lenders and lining their own pockets.

As this Court recognized in its Order dated September 6, 2002, "[I]t is undisputed that … Christopher Trikeriotis, the president of Title Express and general counsel for Bankers First, knowingly participated in the scheme." (Court Paper No. 108, at pages 1-2). Specifically, in the Statement of Facts agreed to by Mr. Trikeriotis in his guilty plea,

---

dismissed with prejudice. In that same stipulation, Mr. Baklor and Bankers First dismissed all remaining claims that they had pending against Mr. Trikeriotis and Title Express.

Mr. Trikeriotis has *admitted* that: the scheme was started by Mr. Baklor as a means of paying off large debts owed by Bankers First; after Mr. Trikeriotis first learned of the scheme in 1998, he then "participated in the ongoing fraud" (at page 13, bottom); and Title Express received fraudulently obtained funds from lenders insured by the FDIC and dispersed them directly to Bankers First.

Prior to his guilty plea, Mr. Trikeriotis was deposed in this case in March 2001. During that deposition, he refused to answer virtually all substantive questions and asserted his Fifth Amendment rights over one hundred times. By contrast, several other witnesses deposed in this case, including Kent Baklor, have testified that Mr. Trikeriotis, who ran Title Express and later in the scheme also ran Bankers First, not only participated in, but also orchestrated the scheme to defraud the lenders.

IV.   **ARGUMENT**

   A.   **Summary Judgment Is Appropriate Where There Is No Dispute of Material Fact and Judgment Is Warranted As a Matter of Law.**

Summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure is appropriate if the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). For purposes of summary judgment, a fact is material if, when applied to the substantive law, it affects the outcome of the litigation. *Id*. at 248. Similar to the standard for a directed verdict, if "under governing law, there can be but one reasonable conclusion," summary judgment should be granted. *Lucas v. Curran*, 856 F.Supp. 260 265 (D. Md. 1994) (Smalkin, J.) (citing *Anderson*, 477 U.S. at 250).

Once a properly supported motion for summary judgment has been made, the party opposing the motion bears the burden of establishing the existence of a genuine

5

issue of material fact. *See Anderson*, 477 U.S. at 248-49. Rule 56(e) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this rule, must set forth *specific facts showing that there is a genuine issue for trial.*" (Emphasis supplied); *accord Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).

The facts, as well as the justifiable inferences to be drawn therefrom, are to be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Nevertheless, the trial court has an affirmative obligation to prevent factually unsupported defenses from proceeding to trial. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

As demonstrated herein, when measured against these well-established standards, it is clear that Mrs. Baklor and What's Up Doc have demonstrated that there is no genuine dispute as to any fact material to Mr. Trikeriotis's and Title Express's claims, and that Mrs. Baklor and What's Up Doc are entitled to judgment as a mater of law.

    **B.**    **Mr. Trikeriotis's and Title Express's Claims for Indemnification Must Fail.**

It is well established under Maryland law that a defendant may seek indemnification *only* when his liability is passive or secondary, which liability is rooted in the concept of imputed or constructive fault. *Pyramid Condominium Ass'n v. Morgan*, 606 F. Supp 592, 596 (D. Md. 1985) (Young, J.), *aff'd*, 823 F.2d 548 (4th Cir. 1987). *See also Westfarm Assocs. Ltd. Partnership v. International Fabricare Inst.*, 846 F.Supp. 422, 437-38 (D.Md.1993), *aff'd sub nom. Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir.1995), *cert. denied*, 517 U.S. 1103, 116

6

S.Ct. 1318, 134 L.Ed.2d 471 (1996); *Blockston v. United States*, 278 F.Supp. 576, 583-88 (D.Md.1968); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership*, 109 Md.App. 217, 277-80, 674 A.2d 106, 135-37 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *Schreiber v. Cherry Hill Constr. Co.*, 105 Md.App. 462, 478-79, 660 A.2d 970, 978-79, *cert. denied*, 340 Md. 500, 667 A.2d 341 (1995); *Baltimore & Ohio R.R. Co. v. County Comm'rs of Howard County*, 113 Md. 404, 414-16, 77 A. 930, 933-34 (1910); *Baltimore & Ohio R.R. Co. v. County Comm'rs of Howard County*, 111 Md. 176, 185-86, 73 A. 656, 658-59 (1909); *State v. Capital Airlines, Inc.*, 280 F.Supp. 648, 650 (S.D.N.Y.1964).

"The determination of whether a tortfeasor's negligence is active or passive must be made by referring to the plaintiff's [original] complaint against the defendant seeking to implead the third party." *Pyramid Condominium*, 606 F. Supp at 596.  Here, National Mortgage Warehouse and Sovereign Bank alleged *active* involvement by Mr. Trikeriotis and Title Express in fraud, deceit, and misrepresentation.  For example, the Complaints allege that:

> •"Title Express, through its principal, Trikeriotis, did not and could not close on the Fictitious Loans since the borrowers were non-existent.  Rather after the date set for closing on the those loans, Title Express, without Sovereign's knowledge, authorization or consent, released the funds advanced by Sovereign to Bankers First, which thereafter dissipated the funds."  Sovereign Bank's Complaint, ¶ 25; *see also* NMW's Complaint, ¶ 16.
>
> •The scheme "had been created and managed by Trikeriotis through Trikeriotis' company, Title Express."  Sovereign Bank's Complaint., ¶ 26.
>
> •Fictitious notes signed by "non-existent borrowers … were forged by … Trikeriotis or by others employed by or associated with … Title Express at the direction of Baklor or Trikeriotis."  *Id.*, ¶ 39 (Count III).
>
> •"Title Express represented to Sovereign that it would get the loan documents signed, close the loans, disburse the funds to the borrowers, and send the signed original notes to Sovereign.  Instead it kept Sovereign's advances of its own use

7

and/or that of Bankers First, and the principals of Title Express and Bankers First, Baklor and Trikeriotis." *Id*., ¶ 41 (Count III).

•" Bankers First, Baklor, Timothy Burgess [a Bankers First employee], Title Express, and Trikeriotis … all knew that the … 'Original' Notes transmitted after the non-existent closing were forged, … used the proceeds [of the scheme] for their own purposes …, acted with intent to defraud Sovereign, and … acted wantonly and maliciously with an evil and rancorous motive…" *Id*., ¶ 43 (Count III).

•"Title Express represented to NMW that it would get the loan documents signed, close the loans, disburse the funds to the borrowers, and send the signed original Notes to NMW. Instead, it [Title Express] kept NMW's advances for its own use and/or that of Bankers First, and the principals of Title Express and Bankers First, Baklor and Trikeriotis. NMW's Complaint, ¶ 41 (Count III).

•"… Bankers First, Baklor, Title Express, and Trikeriotis … all knew that the requests for advances were made for loans which not going to be made, … [knew] that the 'Original' Notes transmitted after the non-existent closings were forged, used the proceeds of the advances for their own purposes…, knew that the NMW did not know that the loans for which advances were requested were fabricated, … acted with the intent to defraud NMW, and acted wantonly and … outrageously…" *Id*., ¶ 43 (Count III).

All of these allegations regarding Mr. Trikeriotis's and Title Express's active involvement in the fraud scheme in the two Complaints have now become established fact. In its January 15, 2002 Order, the Court granted summary judgment in favor of the lenders on these allegations, and specifically on Count III in both Complaints. Furthermore, Mr. Trikeriotis has pled guilty to bank fraud, 18 U.S.C. § 1344, arising out of these same facts. As the Court recognized in its January 15, 2002 Memorandum Opinion, "[a]s part of his guilty plea, Trikeriotis agreed to a Statement of Facts which leaves the material allegations in the NMW and Sovereign complaints *undisputed* …., [and] the extensive statement of facts submitted in connection with the plea constitutes *a full admission by him that he engaged in fraud* against NMW and Sovereign Bank." (Court Paper No. 96, at pages 2-3, emphases added).

8

This Court has determined that Mr. Trikeriotis is collaterally estopped from denying the truth of these allegations. *See id*. at 2. This Court has also determined that because Mr. Trikeriotis "is the president and chief officer of Title Express, his guilty plea also precludes his company from denying liability in connection with these transactions." *Id*. at 3.

Mr. Trikeriotis, therefore, is an admitted *active* tortfeasor, who is collaterally estopped from denying such involvement. As a matter of law, he cannot recover for indemnification from any other third party, including and especially Mrs. Baklor.

### C. Mr. Trikeriotis's and Title Express's Claims for Contribution Must Fail.

The contributions claims against Mrs. Baklor and What's Up Doc are also without merit. It is well established under Maryland law that in order to state a cognizable claim based on contribution, the third-party plaintiff joint tortfeasors (here, Mr. Trikeriotis and Title Express) must have actually paid the entire claim or at least more than their *pro rata* share of the liability. Until that time, there is no basis for a judgment of contribution. *See Baltimore County v. Stitzel,* 26 Md. App. 721, 728 (1975) (reversing a judgment that split the total liability to the plaintiff between two joint tortfeasors because the moving tortfeasor had not "paid the common liability or paid more than his *pro rata* share of that liability."); *see also Jackson v. Cupples*, 239 Md. 637 (1965); *Southern Maryland Oil Co. v. Texas Company*, 203 F. Supp. 449) (D.Md. 1962). As Judge Northrop wrote in *Southern Maryland Oil*, "the rights to both indemnification and contribution [under Maryland law], whether based on contract or tort, accrue at the time of payment *and not before.*" 203 F.Supp. at 452-53 (*citing O'Keefe v. Baltimore TransitCo.,* 201 Md. 345 (1953)) (emphasis added).

9

The case law follows the statute. Maryland Courts & Judicial Proceedings Article 3-1402 specifically provides that "[a] joint tort-feasor is not entitled to a money judgment for contribution *until* the joint tort-feasor has by payment discharged the common liability or has paid more than a pro rata share of the common liability." (Emphasis added).

Since being placed on supervised release in August of 2003, Mr. Trikeriotis has paid a total of eight hundred dollars (**$800**) toward his debt of $6,359,426.85 to National Mortgage Warehouse or Sovereign Bank. Even giving Mr. Trikeriotis the benefit of the doubt that he actually intends to repay the money he stole, it seems extremely unlikely that he will ever be able to pay the judgment against him or any amount close to a *pro rata* share. As a result, Trikeriotis' claim for contribution is simply not ripe, and his case should be dismissed without prejudice to refile the claim if and when he pays the entire judgment or more than his *pro rata* share.[2]

####    D.    The Defamation Claim Cannot Stand.

Mr. Trikeriotis's third party claims against Mrs. Baklor for defamation (Count III of the Amended Third-Party Complaint in the suit initiated by NMW, CCB-00-2881), simply alleges that on August 30, 2000, when Mrs. Baklor, in her individual capacity and as President of What's Up Doc, met with representatives of National Mortgage Warehouse Bank, she stated that Mr. Trikeriotis had "participated in and masterminded a scheme to defraud National Mortgage Warehouse, all of which Diane Baklor knew to be false." A necessary element of any defamation claim is falsity of the statement. *Bagwell v. Peninsula Regional Med.,* 106 Md. App. 470, 510-11 (1995), *cert. denied,* 341 Md.

---

[2] The statute of limitations with respect to this claim will not even begin to run until Mr. Trikeriotis has paid the judgment and established his entitlement to contribution. *See Southern Maryland Oil Co. v. Texas Company*, 203 F. Supp. 449) (D.Md. 1962).

172 (1996). A "false statement is one that is *not substantially correct*." *Gohari v. Darvish,* 767 A.2d 321, 334 (Md. 2001) (emphasis added). The flip side of this rule is that truth is an absolute defense to a claim for defamation. *Bowie v. Evening News Co.*, 151 Md. 285, 134 A. 214, 219 (1926) ("The general rule … is that … the truth of the statement alleged to have been defamatory … is a complete and effectual defense to the action.").

The first problem with Mr. Trikeriotis's defamation allegation is that Mrs. Baklor made no such statements to representatives of NMW. The undisputed evidence shows that while Mrs. Baklor was present at the August 30, 2000 meeting with NMW, Kent Baklor was the person who informed NMW of Mr. Trikeriotis's involvement in the scheme. *See* Memorandum of J. Doyle[3] found in NMW's Motion for Partial Summary Judgment against Mr. Trikeriotis and Title Express (Court Paper No. 56), Ex. A at ¶ 9 (Affidavit of Mary Ellen Larson), Ex. 3 thereto (Doyle Memorandum) (citations to this prior pleading will hereinafter be referred to as "NMW's Motion for Summary Judgment, Ex. __, at __").

The second problem with Mr. Trikeriotis's defamation claim is that even if he can prove Mrs. Baklor made such statement (which he cannot), he certainly cannot prove the falsity of the statements given his guilty plea and the undisputed evidence in this case. First, Mr. Trikeriotis's guilty plea to bank fraud against NMW proves the truth of the alleged statements. And second, that he "masterminded" the scheme is clearly undisputed given Mr. Trikeriotis's repeated assertion of his Fifth Amendment rights in

---

[3] One of the NMW officers attending that meeting, Joe Doyle, NMW Executive Vice President, subsequently recorded statements and admissions made in the meeting in a memorandum dated September 6, 2000. His affidavit attesting to the authenticity of his memorandum, his personal participation in the meeting described therein, and the accuracy of the statements and admissions recorded in the memorandum, including those attributed to other persons and any of his own statements, is attached to Court Paper No. 57, NMW's Supplemental .Memorandum In Support of Its Motion for Summary Judgment.

11

response to virtually all questions posed in his deposition -- from which the Court may draw adverse inferences -- as well as other undisputed corroborating testimony. *See Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (citing 8 J. WIGMORE, EVIDENCE 439 (MCNAUTON REV. 1961)) ("Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them"); *United States v. Sasscer*, 86 A.F.T.R.2d 2000-7118, 2000 WL 1683465 (D. Md. Nov. 8, 2000) ("In a civil case, a negative inference may be drawn based on an assertion of Fifth-Amendment privilege, and as long as other evidence supports it, summary judgment may properly be given.")(citing *LaSalle*; *Federal Deposit Ins. Corp. v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994)); *United States v. Ianniello*, 824 F.2d 203, 208 (2nd Cir. 1987)**.**

Mr. Trikeriotis was deposed on March 19 and 20, 2001. Mr. Trikeriotis testified that he observed and was a part of everything that occurred at Title Express, and that he knew about and authorized all of the day-to-day operations at Title Express. *See* NMW's Motion for Summary Judgment Ex. B (Deposition of Mr. Trikeriotis), at 101, 115-16. Those were the only material questions to which he responded without asserting his Fifth Amendment Privilege. When asked about the allegations of NMW's Complaint, and when confronted with documentary evidence of the fictitious loans that NMW was fraudulently induced to make, Mr. Trikeriotis invoked his privilege and refused to answer questions that sought relevant information about his involvement in the scheme described in Count III of NMW's Complaint. Indeed, he invoked the privilege *well over one hundred times* during his deposition. For example, Mr. Trikeriotis asserted his Fifth Amendment privilege when asked whether NMW transferred funds to Title Express, and when asked who gave the wire instructions to NMW. *Id*. at 314-17.

12

By contrast, in his deposition on April 12, 2001, Mr. Baklor acknowledged the existence of the fraud described in NMW's Complaint, and testified that Mr. Trikeriotis played a leading role in executing the scheme. For example, Mr. Baklor testified that:

· Beginning at least as early as 1998, and continuing thereafter through at least August 2000, Bankers First submitted fictitious loan documentation to obtain advances on warehouse lines of credit that Bankers First obtained from and maintained at several mortgage warehouse lenders, including NMW, and that the number and value of such fictitious loans significantly increased over time, particularly after Trikeriotis began to "run" Bankers First. NMW's Motion for Summary Judgment, Ex. D at 52, 64 (Deposition of Mr. Baklor).

· Mr. Trikeriotis first "informed" Mr. Baklor that loans had been made to fictitious borrowers. *Id*. at 52.

· In early 1998, Trikeriotis, who had recently joined Bankers First as Corporate Counsel, *volunteered* to manage these phony loans, because Baklor was busy with certain personal matters and the rest of the business. *Id.* at 64.

· When Trikeriotis first "informed" Baklor of these fictitious loans, Baklor believed there was a discrepancy of between $250,000 and $400,000 (allegedly caused by mismanagement under Bankers First's then CFO, John Hall). By September, 2000 NMW's loss exceeded seven million dollars. *Id.* at 116. Trikeriotis never counseled Baklor to stop the fraud. *Id*. at 101. Even after threatening to terminate the title and escrow services of Title Express on May 30, 2000, Trikeriotis agreed to continue *provided that Baklor follow Trikeriotis's instructions more carefully*. *Id.* at 159-60.

In addition, at the August 30, 2000 meeting with NMW, Mr. Baklor (whose attorneys accompanied him) stated that, although he knew about, acquiesced to, and participated in the scheme to defraud NMW, the scheme was orchestrated and managed by Trikeriotis. NMW Motion For Summary Judgment, Ex. A at ¶ 9 (Affidavit of Mary Ellen Larson) and Exhibit 3 thereto (Doyle Memorandum).

Other witnesses have similarly testified that Mr. Trikeriotis orchestrated the scheme. For example:

· Bruce W. Tharp testified that Trikeriotis supervised and directed the day-to-day activities of Bankers First, including setting salaries and hiring and firing of employees. NMW's Motion for Summary Judgment, Ex. K (Tharp Deposition),

at 149-50, 172; *see also* NMW's Motion for Summary Judgment, Ex. H (Bankers First 30(b)(6) Deposition) at 47-48.

·   Tharp testified that, when he (Tharp) asked Baklor if what Trikeriotis was telling him to do was correct and proper, Trikeriotis told Tharp that he would be fired if he ever went to Baklor again.  NMW's Motion for Summary Judgment, Ex. K at 140-42.

·   Trikeriotis also talked to Tharp about removing Baklor from his position at Bankers First.  *Id.* at 143-44.

·   Sometime between August 1, 2000 and Labor Day, 2000, Trikeriotis asked an individual providing computer services for Bankers First and for Title Express how he (Trikeriotis) could delete past data from the accounting systems of Bankers First.  *Id.*, at 97-99, 102, 106-08.

·   Trikeriotis directed the activities of Timothy C. Burgess, Bankers First's manager of warehouse lines of credit and loan servicing.  *Id.* at 150-51, 174-76.  Mr. Burgess was the signatory on the advance requests made by Bankers First to NMW to fund fictitious loans.  *See* NMW's Motion for Summary Judgment, Exs. E to G (bad loan files).  Mr. Burgess was also the employee responsible for producing spreadsheets documenting the fictitious loans.  *See* NMW's Motion for Summary Judgment, Ex. N (spreadsheet); NMW's Motion for Summary Judgment, Ex. D (Baklor Deposition) at 34.

·   Another employee, Dorothy Pumputis, testified that Trikeriotis supervised the operations of Bankers First during the entire period of the Agreement with NMW.  NMW's Motion for Summary Judgment, Ex. H (Bankers First Depo), at 29-30.

·   Ms. Pumputis also testified in deposition that, in December 1999, she came across a log of warehouse loans.  One of the loans bore her name as the person responsible for closing the loan, but she knew nothing about it.  *Id*. at 91-94.  Pumputis questioned Trikeriotis about the loan, and he replied that he would get back to her about it, but never did.  *Id.* at 93-98.  She also stated that a paper which referenced the loan "disappeared" from her desk.  *Id.* at 93, 97.

·   Sharon White stated that, "when Chris Trikeriotis joined the company . . . he began giving instructions and orders and saying words to the effect that he was running the company and that I should take orders from him."  *Id.* at 39.  Moreover, she stated that her "personal observation was that [Trikeriotis] was in every department handling things, attempting to manage things . . . ."  *Id.* at 51.

Thus, even if Mr. Trikeriotis could prove that Mrs. Baklor stated to NMW that he participated in and masterminded the fraud scheme (which he cannot), the undisputed evidence shows the truth of the alleged statements.  Mr. Trikeriotis pled guilty to

14

committing fraud against NMW, admitted in his deposition that he ran and authorized the day-to-day operations of Title Express, repeatedly asserted his Fifth Amendment rights during his deposition, from which the Court is permitted to draw adverse inferences. Such adverse inferences are supported by the numerous witnesses who have testified that Mr. Trikeriotis ran the operations of Bankers First and orchestrated the scheme. The undisputed material facts show that as a matter of law, Mr. Trikeriotis cannot succeed on his claim for defamation against Mrs. Baklor.[4]

      E.    **Mr. Trikeriotis and Title Express Have No Basis for Their Claims of Tortious Interference with Contract or Conspiracy Against Mrs. Baklor and What's Up Doc.**

In Count III of his Third Party Claim in the case initiated by Sovereign Bank, Mr. Trikeriotis and Title Express seek recovery from Mrs. Baklor and What's Up Doc based on their alleged tortious interference with contract. Specifically, Mr. Trikeriotis and Title Express allege that Mrs. Baklor (on behalf of Bankers First and apparently What's Up Doc) submitted inappropriate claims to Trikeriotis's civil co-defendant Security Title Guarantee Corporation of Baltimore ("Security") on several loans, thereby interfering with Trikeritois' contractual relationship with Security. Security was a title insurance company, for which Title Express was authorized to act as agent and issue title insurance binders as part of its title and settlement business. The loans for which Trikeriotis claims Mrs. Baklor submitted claims on to Security were twelve of the fifty-plus fictitious loans at issue in the civil and criminal cases. *See* Third Party Complaint, ¶¶ 54-56.

Putting aside whether Diane Baklor had anything to do with any "claims" being submitted to Security on twelve transactions (which she did not), once again, now that

---

[4] Furthermore, one must question whether Mr. Trikeriotis has any cognizable damages on his claim for defamation. Title Express no longer exists, and now that he is a convicted felon, he cannot claim that any statements allegedly made by Mrs. Baklor caused him to lose business, or his license, as a title agent. *See Gohari*, 767 A.2d at 334 ("the Plaintiff must prove that he suffered harm as a result of the defamatory statement").

15

Mr. Trikeriotis has pled guilty to criminal bank fraud against Sovereign Bank, he has no basis whatsoever for this claim.  At the time this claim was filed, Mr. Trikeriotis had not been charged and was maintaining his innocence of any culpability in the scheme.  Given his guilty plea, Mr. Trikeriotis can hardly now claim Mrs. Baklor is somehow liable for interfering with a "contractual relationship" that was based entirely on fraud.

Furthermore, after Security filed a motion for summary judgment, Mr. Trikeriotis and Title Express voluntarily dismissed their claims for breach of contract against Security.  (Court Paper No. 72).  One of the necessary elements of Trikeriotis' claim for tortious interference with contract is that Diane Baklor's tortuous interference caused Security to breach its contract with Mr. Trikeriotis.  *Fraidin v. Weistzman*, 93 Md. App. 168, 611 A.2d 1046 (1992), *cert. denied*, 329 Md. 109, 617 A.2d 1055 (1993).  Mr. Trikeriotis' dismissal of his claim for breach of contract against Security not only indicates that he cannot satisfy this crucial element of his claim against Diane Baklor, but also underscores the fact that by creating the bank fraud scheme, *he* breached the contract, *not Security*.  Accordingly, summary judgment should be granted in favor of Mrs. Baklor and What's Up Doc on this count.

For similar reasons, Mr. Trikeriotis's and Title Express's final claim against Mrs. Baklor -- civil conspiracy – must also fail.  Specifically, Trikeriotis and his defunct company seek recovery on the allegation that "Diane Baklor, [Bruce] Gordon, and [Leonard] Resnick entered into an unlawful agreement with one another, Kent E. Baklor, and others employed by [Bankers First] and What's Up Doc to tortiously damage Trikeriotis and [Title Express]." Third Party Claim, S-01-0057, Count IV.[5]  Trikeriotis has already admitted criminal liability for his participation in the fraudulent scheme, and

---

[5] Notably, in February 2002, Mr. Trikeriotis and Title Express voluntarily dismissed this and all other claims they had against Messrs. Gordon and Resnick.  (Court Papers Nos. 101 and 102).

it is completely illogical that Mrs. Baklor could somehow be civilly liable to him for a scheme that he admittedly and undisputedly orchestrated to defraud NMW and Sovereign out of millions of dollars. The doctrine of proximate causation applies to actions for civil conspiracy, *see Daugherty v. Kessler*, 264 Md. 281, 292, 286 A.2d 95, 101 (1972), and in this situation where Mr. Trikeriotis was an active tortfeasor, it can hardly be said that Mrs. Baklor proximately caused any damage to Mr. Trikeriotis resulting from his own fraudulent conduct.

V.     CONCLUSION

The Court should grant summary judgment in favor of Diane Baklor and What's Up Doc on all Third Party claims brought against them by Mr. Trikeriotis and Title Express.

Respectfully submitted,

_____**/S/**_____
Andrew C. White
Susan Q. Amiot
Law Offices of Andrew C. White, LLC
Suite 2600
201 North Charles Street
Baltimore, MD  21201
410-576-2200,
*COUNSEL FOR DIANE BAKLOR*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of March, 2004, I sent a copy of the foregoing pleadings via Electronic Case Filing to all counsel of record, to the following:

David Applefeld, Esquire
Adelberg, Rudow, Dorf & Hendler
600 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201

*Attorneys for Christopher Trikeriotis*

D. Christopher Ohly, Esquire
Blank, Rome
250 West Pratt Street
Suite 1100
Baltimore, MD 21201,

*Attorneys for National Mortgage Warehouse*

               _____/S/_____
               Andrew C. White