# BLANK ROME COMISKY & McCAULEY LLP

*Counselors at Law*

**FILE COPY**

Delaware
Florida
Maryland
New Jersey
New York
Pennsylvania
Washington, DC

*Direct Dial:* (410) 659-3960
*Email:* ohly@blankrome.com

July 25, 2002

Andrew Radding, Esquire.
Adelberg, Rudow, Dorf & Hendler, LLC
600 Mercantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, Maryland 21201

Frank Gorman, Esquire
Gorman & Williams
2 N. Charles Street, Suite 750
Baltimore, Maryland 21201

Gentlemen:

Nearly a month ago, I spoke with Andy Radding about a potential settlement of National Mortgage Warehouse's and Sovereign's claims against Joyce Trikeriotis. Enclosed is a draft settlement agreement relating to those claims. I regret that I was not able to finish this draft as quickly as I had initially hoped.

The attached agreement is in many ways similar to agreements entered into between National Mortgage Warehouse and Sovereign, on the one hand, and Kent and Diane Baklor, on the other hand. While the structure is similar, I have revised the agreement to take into account the different economic circumstances of the Trikeriotis' and the Baklors. The numbers contained in the draft agreement are based on my best understanding of the facts at this point. Obviously, since this is a first draft, we look forward to any revisions you may suggest with an open mind.

I look forward to hearing from you both about this draft agreement. I am out of the office now on vacation and will return on August 5. In the meanwhile, please feel free to contact my associate, Bobbi Daghir, with any initial questions or comments you may have.

Frank, I understand that our supplemental status report is due to Judge Blake tomorrow. I believe that it would be prudent in light of the existing schedule, to agree to an extension of the various discovery deadlines to accommodate what will hopefully be

250 West Pratt Street, Suite 1100 • Baltimore, Maryland 21201 • 410.659.1400 • Fax: 410.659.1414
www.blankrome.com

# BLANK ROME COMISKY & MCCAULEY LLP

Messers Gorman and Radding
July 25, 2002
Page 2

productive settlement discussions without the immediate continued expenditures required by litigation.  If the parties can all come to some agreement, monies that would otherwise be spent on litigation can be used to resolve National Mortgage Warehouse's and Sovereign's claims and preserve the Trikeriotis' remaining assets.

Very truly yours,

D. Christopher Ohly

DCOpml

Enclosures

DRAFT

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into this ___ day of July 2002, by and between Christopher Trikeriotis ("Mr. Trikeriotis") and Joyce Trikeriotis ("Mrs. Trikeriotis"), both individually and as tenants by the entireties, on the one hand, and National Mortgage Warehouse, LLC ("NMW") and Sovereign Bank, FSB ("Sovereign"), on the other hand.

WHEREAS, Bankers First Mortgage Co. Inc. ("BFM") is a Maryland corporation that provided residential mortgage loans to consumers;

WHEREAS, Mr. Trikeriotis was an attorney engaged by BFM, as well as the owner and operator of one or more businesses which supplied services to BFM, including, but not limited to, Title Express, Inc. and Mr. Trikeriotis' law firm;

WHEREAS, in litigation described more fully below, NMW and Sovereign have alleged that Mr. Trikeriotis acted as BFM's agent, both directly and through the entities described above;

WHEREAS, Joyce Trikeriotis is and at all times relevant hereto has been married to Mr. Trikeriotis;

WHEREAS, in litigation described more fully below, NMW and Sovereign have alleged that assets were transferred by Mr. Trikeriotis to Mrs. Trikeriotis, in violation of Maryland's Fraudulent Conveyance Act, codified at Md. Commercial Law Code §§ 15-201 *et seq.*;

WHEREAS, NMW is in the business of providing secured warehouse lines of credit to mortgage bankers;

WHEREAS, in the Fall of 1999, BFM submitted to NMW an application to enter into a lender/borrower relationship with NMW, pursuant to which NMW would provide BFM with a line of credit to be used to fund residential mortgage loans, which application included, among

other things, information about BFM's financial status which was not true or correct in every

material respect, and which BFM and its officers, agents and representatives knew was not true

or correct in every material respect;

WHEREAS, on October 4, 1999, in reliance on the information which BFM provided in

its application, NMW entered into a lender/borrower relationship with BFM whereby NMW,

under terms and conditions set forth in a Warehouse Credit and Security Agreement, agreed to

provide BFM with a line of credit up to $7.5 million to be used to fund residential mortgage

loans;

WHEREAS, on October 4, 1999, BFM executed a promissory note in favor of NMW

evidencing its indebtedness to NMW up to $7.5 million;

WHEREAS, Sovereign is a federally chartered savings bank;

WHEREAS, in Spring of 1998, BFM submitted to Sovereign's assignor, Green Shield

Limited LLC ("Green Shield"), an application to enter into a lender/borrower relationship,

pursuant to which BFM would obtain a line of credit to be used to fund residential mortgage

loans, which application included, among other things, information about BFM's financial status

which was not true or correct in every material respect, and which BFM and its officers, agents

and representatives knew was not true or correct in every material respect;

WHEREAS on or about April 6, 1998, in reliance on the information which BFM

provided in its application, Sovereign's assignor, Green Shield, entered into a lender/borrower

relationship whereby Green Shield, and later, Sovereign, under terms and conditions set forth in

a Warehouse Credit and Security Agreement, agreed to provide BFM with a line of credit up to

$5 million to be used to fund residential mortgage loans;

2

WHEREAS, on April 6, 1998, BFM executed a promissory note in favor of Sovereign (as Green Shield's assignee and successor holder of the note) evidencing its indebtedness to Sovereign up to $5 million;

WHEREAS, Mr. Trikeriotis, while acting as agent and attorney for BFM, both directly and through the entities described above, actively assisted BFM in submitting the applications to NMW and Green Shield, described above, in order to induce them to enter into the financial relationships described above;

WHEREAS, Mr. Trikeriotis, while acting as agent and attorney for BFM, both directly and through the entities described above, and as principal of Title Express, both on behalf of BFM and for the benefit of Title Express and himself, knowingly participated in the submittal of requests to NMW advances on account of fictitious borrowers (the "Fraudulent Activity");

WHEREAS, Mr. Trikeriotis, while acting as agent and attorney for BFM, both directly and through the entities described above, and as principal of Title Express, both on behalf of BFM and for the benefit of Title Express and himself, knowingly participated in the submittal of requests to Green Shield and Sovereign for advances on account of fictitious borrowers (the "Fraudulent Activity");

WHEREAS, NMW and Sovereign have obtained judgments in consolidated civil actions against Kent Baklor, BFM, Christopher Trikeriotis, and Title Express, Inc., in the United States District Court for the District of Maryland, captioned, respectively, *National Mortgage Warehouse, LLC v. Bankers First Mortgage Co., Inc.*, No. CCB-00-2881 and *Sovereign Bank v. Bankers First Mortgage Co.*, No. S-01-57 (collectively, the "Litigation"), which asserted, among other things, causes of action for fraud, deceit, misrepresentation, conspiracy, and conversion arising out of the Fraudulent Activity (the "Claims");

3

WHEREAS, Mr. Trikeriotis pled guilty to criminal charges arising from the fraud perpetrated against NMW and Sovereign, described above;

WHEREAS, on or about _____, the United States District Court for the District of Maryland granted NMW's and Sovereign's motions for summary judgment against Mr. Trikeriotis, in the Litigation, and entered judgment against Mr. Trikeriotis in the amount of $_____ (the "Trikertiotis Judgment");

WHEREAS, on or about _____, NMW commenced a civil action against Mrs. Trikeriotis in the United States Federal District Court for the District of Maryland (the "Joyce Trikeriotis Litigation"), in an action *National Mortgage Warehouse v. Joyce Trikeriotis*, Civil No. CCB 01 CV 3275;

WHEREAS, the Complaint in the Joyce Trikeriotis Litigation alleges, among other things, that at a time when BFM was insolvent, under-capitalized for its business, indebted beyond its ability to pay, and acting to defraud its creditors, Mr. Trikeriotis (and the other co-venturers) caused Mrs. Trikeriotis to be put on BFM's payroll, even though she performed no work for, and provided no goods or services to, BFM, and that some or all of these funds were deposited into a joint checking account, available to both Chris and Joyce Trikeriotis, and that they used these funds to obtain equity in their family home, motor vehicles and other items of value to them;

WHEREAS, the Complaint in the Joyce Trikeriotis Litigation alleges, among other things, that Mr. Trikeriotis dissipated some of his ill-gotten gains by transferring monies that he received, in addition to those paid directly to Mrs. Trikeriotis, by transferring portions of those monies to Mrs. Trikeriotis;

4

WHEREAS, the Complaint in the Joyce Trikeriotis Litigation alleges, among other things, that these transfers of assets violated of Maryland's Fraudulent Conveyance Act, codified at Md. Commercial Law Code §§ 15-201 *et seq.*;

WHEREAS, Mrs. Trikeriotis has denied the allegations made in the Complaint in the Joyce Trikeriotis Litigation and, in particular, has denied that she received or was the beneficiary of any assets alleged to have been transferred in violation of Maryland's Fraudulent Conveyance Act, codified at Md. Commercial Law Code §§ 15-201 *et seq.*, and that any such violation occurred;

WHEREAS NMW, Sovereign, Mr. Trikeriotis and Mrs. Trikeriotis wish to settle the Claims, the Litigation, the Joyce Trikeriotis Litigation and all potential claims NMW and Sovereign may have against Mr. Trikeriotis and Mrs. Trikeriotis arising out of or related to the Fraudulent Activity, or arising out of the alleged transfer of assets by Mr. Trikeriotis to or for the benefit of Mrs. Trikeriotis, without further controversy and legal expense; and

WHEREAS, Mr. Trikeriotis warrants that, since the Litigation was commenced, neither he, nor anyone else under his direction or subject to his influence and control has disposed of, dissipated, conveyed, given, transferred, or otherwise encumbered any assets belonging to him, or in which he has any nominal or beneficial interest, except for the purpose of compensating or reimbursing counsel or to pay the ordinary, necessary, and reasonable living expenses incurred on a regular basis by him or any dependants;

NOW, THEREFORE, in consideration of the mutual promises, covenants, and representations set forth herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, NMW, Sovereign, Mr. Trikeriotis and Mrs. Trikeriotis hereby agree as follows:

5

1.    The recitals set forth at the beginning of this Agreement are a material part of this

Agreement, and are hereby incorporated as a part of this Agreement. Mr. and Mrs.

Trikeriotis each acknowledge that, in entering into this Agreement, NMW and Sovereign

have relied upon the representations made in the recitals set forth above, and that NMW

and Sovereign have a right to rely upon those representations. Any representations or

warranties made in this Agreement will survive as to NMW so long as any portion of the

obligation in favor of NMW described in this Agreement remains outstanding and unpaid

as to NMW. Upon payment in full of the obligation in favor of NMW described in this

Agreement, such representations and warranties will be of no force or effect as to NMW.

Any representations or warranties made in this Agreement will survive as to Sovereign so

long as any portion of the obligations in favor of Sovereign described in this Agreement

remains outstanding and unpaid as to Sovereign. Upon payment in full of the obligations

in favor of Sovereign described in this Agreement, such representations and warranties

will be of no force or effect as to Sovereign.

2.    Nothing in this Agreement shall in any way affect, alter, modify or impair the

enforceability, collectibility, duration or amount of the Trikeriotis Judgment which,

notwithstanding any other provision of this Agreement, remain enforceable in accordance

with its terms.

3.    Mr. and Mrs. Trikeriotis agree jointly to pay to NMW, to be apportioned between

NMW and Sovereign as they see fit, payments in the amounts specified in paragraphs 11

and 12 of this Agreement, up to a total obligation of $500,000, except that any portion of

the $500,000 obligation set forth in this paragraph that remains unpaid after 25 years

from the date on which this Agreement is entered shall be forgiven, unless Mr. or Mrs.

6

Trikeriotis commits a Material Breach of this Agreement, as defined in paragraph 4, below.

4.    For purposes of this Agreement, a Material Breach is defined as:

    A.    The failure by Mr. or Mrs. Trikeriotis to make full payment of the monthly obligation due under paragraph 11 of this Agreement within 10 business days after the date on which such payment is due; *or*

    B.    The failure by Mr. or Mrs. Trikeriotis to make full payment of the amount due under paragraph 12 of this Agreement on or before May 15th of the year in which a payment is due under paragraph 12; *or*

    C.    The failure by Mr. or Mrs. Trikeriotis to substantially comply with the reporting requirements set forth in paragraph 10 of this Agreement, or any other provision requiring Mr. or Mrs. Trikeriotis to take or refrain from taking any action.

5.    Mr. and Mrs. Trikeriotis shall cooperate fully with NMW and Sovereign in any and all civil, criminal, and administrative investigations and proceedings related in any way to the Fraudulent Activity.  Such cooperation shall consist of giving complete and truthful testimony and making any and all records and documents available for inspection and copying.

6.    Mr. and Mrs. Trikeriotis shall not dispose of, dissipate, convey, give, transfer, or otherwise encumber any assets or properties, real or personal, tangible or intangible, belonging to either of them, either individually, jointly or as tenants by the entireties, or in which either of them has any nominal or beneficial interest as of the date of this Agreement, except (a) for the purpose of paying ordinary monthly bills rendered by his counsel for actual expenses paid by such attorneys to third parties, or for services

7

previously rendered and billed on an hourly basis at such attorneys' usual and customary rates charged to their best customers, or (b) as otherwise provided hereafter n this agreement.

7.    Mr. and Mrs. Trikeriotis, individually, jointly, and as tenants by the entireties, and on behalf of any entity in which either of them may have, or may have had, any economic interest, hereby grant and convey to NMW and Sovereign, to be jointly held, a lien on and security interest in any of their now owned and hereafter acquired assets and properties, real and personal, tangible and intangible, of whatever kind and nature and wherever located, and the proceeds thereof, as security and collateral for the performance of American's obligations under this Agreement. Such assets and properties include, without limitation, inventory, accounts, general intangibles, chattel paper, instruments, interests in partnerships, corporations, other legal entities, stocks, bonds, commercial paper, real estate and buildings thereon, leases, fixtures, and equipment, actions and choses in action, and any other asset of any kind or nature, together with all cash and non-cash proceeds and products thereof. At the request of NMW and Sovereign, Mr. and Mrs. Trikeriotis shall execute such other and further documents as may be necessary in order to perfect the liens and security interests described in this paragraph.

8.    NMW and Sovereign shall take no steps to cause a judgment by confession to be entered against either Mr. or Mrs. Trikeriotis, or to exercise the lien provided and created by paragraph 7, above, except in the event of any Material Breach of this Agreement by either Mr. or Mrs. Trikeriotis, as defined in paragraph 4, above. Instead, Mr. and Mrs. Trikeriotis shall pay the amounts owed under this Agreement, as set forth in paragraphs 11 and 12, below.

8

9.      To the greatest extent allowed by law, Mr. and Mrs. Trikeriotis, individually,

jointly, and as tenants by the entireties, and on behalf of any entity in which either of

them may have, or may have had, any economic interest, shall assign to NMW and

Sovereign Bank, to be held jointly, any and all claims, actions, causes of action, and

choses in action any of them may have, related to the Fraudulent Activity, specifically

including but not limited to claims against John Trikeriotis, Kent Baklor, Diane Baklor,

Bankers First Mortgage Co., Inc., Elizabeth Matos, Title Express, Inc., Timothy Burgess,

Eisenberg, Levy & Kotik, Mark A. Kellman, Mark Kellman & Associates, and any other

person or entity who or which is or may be liable or potentially liable to Mr. and Mrs.

Trikeriotis, individually, jointly, and as tenants by the entireties, and on behalf of any

entity in which either of them may have, or may have had, any economic interest, or any

of them, for or on account of any of the matters addressed in the Complaint in the

Litigation, or addressed in the Joyce Trikeriotis Litigation, or arising out of or related to

the Fraudulent Activity.  Mr. Trikeriotis shall execute any and all documents necessary to

perfect such assignment.

10.     For the lesser of 25 years next following execution of this Agreement or until the

debt identified in this Agreement is extinguished, Mr. and Mrs. Trikeriotis shall provide

to NMW and Sovereign:

      A.      On an annual basis, beginning with the year ending December 31, 2002,

      copies of any and all tax returns that Mr. or Mrs. Trikeriotis, either separately or

      jointly, shall file, for any purpose and with any governmental authority, within 30

      days after any such tax returns may be filed;

B.     On an annual basis, beginning with the year ending December 31, 2002, copies of any and all financial statements, whether or not audited, which Mr. or Mrs. Trikeriotis may prepare or cause to be prepared for any purpose;

C.     On an annual basis, beginning with the year ending December 31, 2002, and within 30 days after any such tax returns may be filed, copies of any and all tax returns that may be filed, for any purpose and with any governmental authority, by, for or relating to any corporation, partnership, limited liability company, sole proprietorship, trust or other entity, with respect to which Mr. Or Mrs. Trikeriotis, or any of their children or other family members may have any nominal, beneficial or other interest, or which Mr. or Mrs. Trikeriotis may sign or cause to be signed, or which Mr. or Mrs. Trikeriotis may prepare or cause to be prepared, or which may otherwise come into the possession, custody or control of Mr. or Mrs. Trikeriotis, in whole or in part;

D.     On a periodic basis, not less than annually, beginning with the year ending December 31, 2001, with copies of any and all wills, trusts instruments, deeds, assignments, powers of attorney and other documents which in any way affect or reveal the ownership of or title to any property, real or personal, or to any monies, stocks, bonds or other such negotiable instruments, or to any other thing of value, which, during the preceding 12 month period, may have been assigned, transferred, disposed of, or otherwise affected in any manner by any act, or by any failure to act, by Mr. or Mrs. Trikeriotis, or by any of their children, or by any of their relatives, or to which Mr. or Mrs. Trikeriotis, their children or their relatives may have or have had any claim or entitlement whatsoever;

10

E.      On a quarterly basis, beginning with the quarter ending March 31, 2002, copies of any and all bank, brokerage, and other such statements that may be issued by any financial institution to Mr. or Mrs. Trikeriotis, either individually, jointly, as tenants by the entireties, or for or on behalf of any other person or entity, either nominally or beneficially, and, at NMW's or Sovereign's request and expense, copies of any detailed receipts, checks, deposit slips, and other such data that may support the entries on any such statements by such financial institutions;

F.      On a periodic basis, not less than annually, with testimony under oath, or though affidavit, at NMW's and Sovereign's direction and discretion, concerning the financial activities of Mr. and Mrs. Trikeriotis, and any and all entities in which either of them may have, or may have had, any economic interest;

G.      Within 15 days after any suit may be filed, copies of any complaint or other such pleading in which Mr. or Mrs. Trikeriotis, or in which any entity in which either of them may have, or may have had, any economic interest, may be named as a party;

H.      Within 15 days after any suit may be filed, copies of any demand by any financial institution or person for immediate payment of any obligation which Mr. or Mrs. Trikeriotis, or in which any entity in which either of them may have, or may have had, any economic interest, may have to any such demanding financial institution or person;

11

I.      Such other and further information concerning the assets, liabilities,

income, and expenses of Mr. or Mrs. Trikeriotis, or in which any entity in which

either of them may have, or may have had, any economic interest, as NMW and

Sovereign may, from time to time, reasonably request.

11.    In each of the 25 years next following the execution of this Agreement,

specifically including the year beginning January 1, 2002, Mr. and Mrs. Trikeriotis shall

pay to NMW (to be apportioned between NMW and Sovereign as they deem fit) a sum

equal to at least $1,000 per month, to be received by NMW no later than the last day of

the month for which payment is due (*i.e.*, payment for January to be received by January

31st, payment for February to be received by February 28th.)

12.    For each of the 25 years next following the execution of this Agreement,

specifically including the year beginning January 1, 2002, Mr. and Mrs. Trikeriotis shall,

in addition to the amounts set forth in paragraph 11, above, pay to NMW (to be

apportioned between NMW and Sovereign as they deem fit) a sum equal to Excess

Income, to be determined as follows.

A.      Base Income means the first $40,000 in gross annual income and gains

earned by Mr. and Mrs. Trikeriotis, from any and all sources whatsoever in the

preceding year, either individually, jointly, as tenants by the entireties, or

otherwise, whether directly or indirectly, and whether through any entity in which

either of them may have, or may have had, any economic interest, or through any

other means or sources.  In determining Base Income and the extent of Excess

Income, if any, the gross income earned by Mr. Trikeriotis from any and all

sources during that tax year shall be considered.

12

B.    Excess Income means fifty percent (50%) of (i)(a) gross annual income and gains earned by Mr. and Mrs. Trikeriotis, from any and all sources whatsoever in the preceding year, either individually, jointly, as tenants by the entireties, or otherwise, whether directly or indirectly, and whether through any entity in which either of them may have, or may have had, any economic interest, or through any other means or sources, (b) less any income taxes (state and federal) for which Mr. or Mrs. Trikeriotis claim on tax returns to be liable, and (c) less any minimum amounts actually paid to NMW pursuant to paragraph 10 of this agreement, and (c) less any additional amounts voluntarily paid by Mr. or Mrs. Trikeriotis, above the minimum provided in paragraph 11, above, excluding amounts paid under this paragraph (the amount calculated in accordance with this subparagraph 12(B)(i) is hereafter called "Adjusted Gross Income"), (ii) all to the extent such Adjusted Gross Income (as defined in subparagraph 12(B)(i)) exceeds Base Income (as defined in paragraph 12(A)).

13

C.    By way of example, and without limitation, in a year in which Mr. or Mrs. Trikeriotis earns $100,000 in gross income from all sources, an amount equal to $60,000, less the taxes which may be paid on such $60,000, and less payments actually paid to NMW, is Excess Income for purposes of this Agreement. Assuming in this example that the total tax paid by Mr. Trikeriotis on the $100,000 in income that he earns on all federal, state and local tax returns he may file, is equal to $25,000, then his total tax rate shall be deemed to be 25% (*i.e.*, $25,000/$100,000). The tax attributed to the $60,000 Excess Income earned by Mr. Trikeriotis, in this example, for purposes of calculating payments on Excess Income, is $15,000 (*i.e.*, 25% of $60,000), and the amount of Excess Income to be paid by Mr. Trikeriotis under this Agreement is $11,500 (*i.e.*, 50% of $45,000 equals $22,500, less $12,000 paid to NMW in minimum monthly installments paid to NMW pursuant to paragraph 11).

The payment due under this paragraph 12 shall be due on May 15th of the year following the tax year for which payment is owed. For example, the payment for the tax year 2002 shall be due on May 15 th, 2003.

13.    Upon Material Breach of this Agreement by either Mr. or Mrs. Trikeriotis, then both of Mr. and Mrs. Trikeriotis authorizes any attorney admitted to practice before any court of record in the United States, on behalf of Mr. and Mrs. Trikeriotis, and either of them, to confess to a judgment for fraud to be entered against each of Mr. Trikeriotis and Mrs. Trikeriotis for the full amount then due under this Agreement ($500,000 less any amounts actually paid to NMW by Mr. or Mrs. Trikeriotis pursuant to this Agreement), plus attorneys' fees of fifteen percent (15%) of the amount due under this Agreement.

14

For purposes of this confessed judgment, Mr. and Mrs. Trikeriotis each consent to the

subject matter and personal jurisdiction of, and agrees that venue shall be proper in, the

United States District Court for the District of Maryland and/or the Circuit Court of

Maryland for Baltimore City, Maryland. Mr. Trikeriotis consents to accept service of

process delivered to their attorney, Andrew Radding, at Adelberg, Rudow, Dorf &

Hendler, LLC, 600 Mercantile Bank & Trust Bldg., 2 Hopkins Plaza, Baltimore,

Maryland 21201. Each of Mr. and Mrs. Trikeriotis hereby waives any other service of

process, and each agrees not to assert any claim that such service is ineffective. Mr. and

Mrs. Trikeriotis each agree that such service shall have the same effect as if process were

personally served on him or her, as the case may be, within the State of Maryland.

14.    In the event of a breach of this agreement entitling NMW and Sovereign to obtain

the confessed judgment provided for in this paragraph, the amount entered may include

principle, interest, default interest, late charges, fees, and costs. Such judgment shall

accrue interest at the statutory rate applicable to judgments obtained in federal courts or

the circuit courts of Maryland, depending on which court NMW or Sovereign elect to file

a complaint to enforce the consents granted by Mr. and Mrs. Trikeriotis, and each of

them, to have judgment entered against him or her, as the case may be.

15.    Mr. and Mrs. Trikeriotis each waive the benefit of any and every statute,

ordinance or rule of court which may be lawfully waived conferring upon Mr. or Mrs.

Trikeriotis, or either of them, whether individually, jointly or as tenants by the entireties,

any right or privilege of exemption, stay of execution, or supplementary proceedings, or

other relief from the enforcement or immediate enforcement of a judgment or related

proceedings on a judgment. The authority and power to appear for and enter judgment

15

against Mr. or Mrs. Trikeriotis shall not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as NMW and/or Sovereign shall deem necessary or advisable, until all sums due under this Agreement have been paid in full. Mr. and Mrs. Trikeriotis each hereby waive any right of appeal he or she might otherwise have to such a judgment. Mr. and Mrs. Trikeriotis each hereby waive any challenge or objection he or she might otherwise have to the basis, sufficiency, or adequacy of consideration for this Agreement, or to his or her liability to NMW or Sovereign.

16.     An adjustment to the amount set forth in paragraph 12(A) of this Agreement as the initial amount defining Base Household Income ($40,000) shall be made on an annual basis under the CPI-U index, as determined by the Bureau of Labor Statistics of the U.S. Department of Labor, in publications by the U.S. Department of Labor, available at large in the four month period immediately prior to the end of each calendar year. Mr. and Mrs. Trikeriotis shall have the burden of demonstrating that any such adjustment should be made for any period for which he or she may claim any such adjustment.

17.     The value of any and all assets conveyed or assigned (including the proceeds thereof), and money paid, to NMW and/or Sovereign by or on behalf of Mr. or Mrs. Trikeriotis, shall be applied by NMW and Sovereign to reduce the debt evidenced by Exhibit A. Upon satisfaction of all that debt, any remaining obligations of the parties to this Agreement shall be immediately extinguished.

18.     Mr. and Mrs. Trikeriotis, both individually, jointly, as tenants by the entireties, on behalf of themselves; on behalf of any entity in which either of them may have, or may

have had, any economic interest, and each of them; and on behalf of any predecessors, successors, assigns, and agents of any of the foregoing, hereby releases NMW and Sovereign and their respective officers, directors, shareholders, parents, subsidiaries, affiliates, trustees, receivers, representatives, attorneys, agents, successors, predecessors and assigns, of and from any and all claims, actions, causes of action and choses in action arising out of or related in any way to the Fraudulent Activity, or arising out of or related in any way to any aspect of the business relationship between BFM and NMW or Sovereign, or arising out of or relating in any way to the Litigation, except an action to enforce this Agreement.

19.    This Agreement is contractual and not a mere recital.  The Agreement embodies the entire agreement between the parties with respect to the subject matter hereof.  This Agreement supersedes any and all prior negotiations, understandings, and agreements between the parties hereto with respect to the subject matter hereof.

20.    There are no representations, warranties, promises, covenants, or undertakings, oral or written, other than those expressly herein set forth.  Each of the parties acknowledges and agrees that none of the other parties has made any representations or promises in connection with this Agreement or the subject matter hereof not contained herein.

21.    This Agreement may not be modified, amended, waived, discharged, or terminated except by an instrument in writing signed by all parties.

22.    This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.

17

23.     Any waiver of any breach, violation, or default under this Agreement shall not be deemed a waiver of any subsequent breach, violation, or default hereof, whether or not of a similar nature.  Acquiescence in a breach, violation, or default shall not be deemed to be a waiver of such breach, violation, or default, even though acquiescence continues for an extended period of time, and the failure of any party to insist upon strict performance of any of the terms or conditions of this Agreement or to exercise any option conferred by this Agreement shall not be construed as a waiver or relinquishment for the future of any such terms, conditions, or options, but the same shall be and remain in force and effect.

24.     In the event that any provision of this Agreement conflicts with any applicable law, such conflict shall not affect the other provisions hereof that can be given effect without the conflicting provision, and to this end, the provisions hereof are declared to be severable.

25.     Every Notice which any party hereto is required or permitted to give to any other party pursuant to the Agreement shall be in writing and shall be delivered by (a) personal delivery, (b) recognized overnight national courier service (such as Federal Express), (c) telecopy, with a duplicate sent simultaneously by certified or registered mail, return receipt requested, first class postage prepaid, or (d) certified or registered mail, return receipt requested, first class postage prepaid, as set forth on the Notice Address Schedule attached hereto and incorporated herein as Exhibit D.  Any Notice delivered to a party's designated address by recognized overnight national courier service shall be deemed to have been given and shall be effective on the date after the Notice is sent to such party's designated address.  Any Notice delivered to the party's designated counsel shall be

18

deemed to have been given and shall be effective as if delivered to the party one day after the Notice is delivered to the party's counsel.

26.    This Agreement shall be construed in accordance with and governed in all respects by the law of Maryland. Any and all disputes that may arise under this Agreement shall be decided under and in accordance with the law of Maryland. No action may be brought to enforce this Agreement, and no action may be brought as a result of any dispute arising by virtue of or under the terms of this Agreement, except in a Maryland State Court, or, to the extent permitted by law, in the Federal Courts, located in Maryland. All of the signatories to this Agreement hereby agree to submit themselves to the personal jurisdiction of a Maryland State Court, or, to the extent permitted by law, the Federal Courts located in Maryland, in which any action to enforce this Agreement may be brought, and no action may be brought as a result of any dispute arising by virtue of or under the terms of this Agreement, and each such signatory hereby waives any defense that he or it may have to the exercise of personal jurisdiction of such Court that any such signatory might otherwise possess.

27.    All of the signatories to this Agreement hereby (i) covenant and agree not to elect a trial by jury of any issue triable of right by a jury, and (ii) waive any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by all of the signatories to this Agreement, and this waiver is intended to encompass individually each instance and each issue as to which the right to a trial by jury would otherwise accrue. All of the signatories to this Agreement are hereby authorized and requested to submit this Agreement to any court having jurisdiction over the subject matter and the parties

19

hereto, so as to serve as conclusive evidence of the matters herein contained regarding waiver of the right to trial by jury. Further, all of the signatories to this Agreement hereby certify that no representative or agent of the other parties (including such parties' counsel) has represented, expressly or otherwise, that the other parties will not seek to enforce this waiver of right to trial by jury provision.

28.     Each of the parties to this Agreement shall be responsible for payment of their own legal fees in connection with the drafting of this Agreement, and in connection with the Litigation.

29.     The parties acknowledge that each of them has had the opportunity to contribute to its drafting and that, as a consequence, the Agreement should not be construed for or against any party to it.

30.     As used in this Agreement, the singular shall include the plural and vice versa, the conjunctive shall include the disjunctive and vice versa, and the masculine shall include the feminine and vice versa, so as to increase wherever possible the scope of the Agreement.

31.     The parties agree that this Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as the original Agreement.

32.     By voluntarily executing this Agreement, the parties confirm that they have had this Agreement fully explained to them by their attorneys, and, in voluntarily executing this Agreement, the parties rely upon their own judgment. By voluntarily executing this Agreement, the parties confirm their competence to understand the Agreement and hereby accept the terms of the Agreement as resolving fully all differences, disputes, and claims within its scope.

_____    _____
Date                                         National Mortgage Warehouse, LLC
                                             By:  Glenn Hedde President


_____    _____
Date                                         Sovereign Bank, FSB
                                             By:  Richard Geld


_____    _____
Date                                         Christopher Trikeriotis


_____    _____
Date                                         Joyce Trikeriotis

21